**[J-52-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 657 CAP |
| | : |
| Appellee | : Appeal from the Order entered on |
| | : 04/04/2012 in the Court of Common Pleas, |
| | : Criminal Division of Montgomery County at |
| v. | : No. CP-46-CR-0002785-2005 |
| | : |
| | : |
| JOHN EICHINGER, | : |
| | : |
| Appellant | : SUBMITTED:   June 19, 2013 |

**OPINION**

**MR. JUSTICE EAKIN**                    **DECIDED:   December 31, 2014**

Appellant, John Eichinger, appeals from the order denying him collateral relief from his criminal convictions and death sentences, pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.   We affirm.

On March 25, 2005, appellant drove to the Montgomery County home of Heather Greaves, planning to murder her if she did not break up with her boyfriend.   Appellant later told police he pre-arranged to meet with Heather so she would be expecting him at her house.   He came armed with a concealed knife and a pair of rubber gloves.

Almost immediately after appellant arrived at Heather's residence, an argument broke out between them in the kitchen.   As Heather turned to walk away, appellant pulled out the knife and stabbed her repeatedly in the stomach.   Appellant later admitted he stabbed Heather in the stomach because he knew from movies and books it was easier to puncture organs that way than stabbing her in the chest, where he would hit bone.

Avery Johnson, Heather's three-year-old daughter, witnessed the stabbing. Heather called out to Avery to call 911. In an attempt to prevent the call, appellant slashed the child in the neck. Avery ran down the hallway and fell. Lisa Greaves, Heather's sister, stepped out of the bathroom. Appellant overpowered Lisa and stabbed her repeatedly to eliminate her as a witness. Appellant then turned back to Avery and stabbed her through the back, momentarily pinning her body to the floor. Appellant then returned to the kitchen, stabbed Heather in the diaphragm, and slit her throat.

While washing his hands in the sink, appellant noticed he was cut. He used one of his rubber gloves to prevent his blood from being left at the crime scene. Before leaving, appellant cut open Lisa's shirt to confuse police into thinking she had been the target of the killings. Appellant was spotted by a neighbor when he left the house. He subsequently drove to work.

Heather and Lisa's father found the three bodies later that day and notified the police. The police tracked appellant to his workplace at the Somers Point Acme market in New Jersey. Appellant agreed to be interviewed, and after a few initial false statements, confessed to the murders. During the same conversation, appellant also confessed to the July 6, 1999, murder of Jennifer Still, in which he used the same knife as in the Greaves/Johnson murders. In a written statement, appellant recalled killing Jennifer because she romantically rejected him, and described slitting her throat in graphic detail.

The police arrested appellant and kept him in a local jail in New Jersey over the weekend. The following Monday, police transported appellant back to Pennsylvania for arraignment. In transit, appellant made another incriminating statement describing the 1999 and 2005 murders. Later, while in jail awaiting trial, appellant wrote journal entries and letters in which he recorded graphic details of both incidents in his own hand.

Trial counsel was appointed[1] and filed an omnibus pre-trial motion to suppress appellant's numerous statements to the police, and to sever the trials for the 1999 and 2005 murders. Following a hearing, the trial court denied appellant's suppression motion, but deferred ruling on the severance claim.

Following the denial of the suppression motion, trial counsel began considering a remorse-based strategy. The plan called for appellant to stipulate to the evidence of both sets of murders at a bench trial, rather than plead guilty, thereby preserving his right to appeal the admission of his numerous confessions. Thereafter, trial counsel would put appellant on the stand and seek to ingratiate him with the penalty phase jury in order to avoid the death penalty.

The trial court granted appellant's previously deferred motion for severance. Jury selection for the separate trials began the same day. The following day, appellant withdrew his severance motion, and the trial court vacated its severance order by agreement of the parties. Appellant then waived his right to a guilt phase jury. See N.T. Trial, 10/18/05, at 3-7. Later the same day, appellant stipulated to the Commonwealth's evidence and was found guilty of four counts of first degree murder at a consolidated guilt phase bench trial. The Commonwealth sought the death penalty for all three of the 2005 murders; the trial court imposed a life sentence for the 1999 murder.

Following conviction, trial counsel filed numerous motions, including a request for a presumption of life instruction, preclusion of victim impact statements, a request for a life without parole instruction,[2] preclusion of the killing of a witness aggravator,[3]

---

[1] Following the appointment of trial counsel, additional counsel was appointed to handle the guilt phase of each trial in the event of severance.

[2] See Simmons v. South Carolina, 512 U.S. 154 (1994).

[3] See 42 Pa.C.S. § 9711(d)(5).

preclusion of the cross-examination of appellant, preclusion of the use of autopsy photos, and preclusion of the use of multiple confessions. See N.T. Pre-trial Motions, 10/31/05, at 3-16.

Following a three-day penalty phase hearing, the jury found at least two aggravating circumstances in the deaths of each victim. See N.T. Trial, 11/3/05, at 80-81. As to Heather, the jury found two aggravating circumstances: (1) appellant had been convicted for another offense for which a sentence of life is imposable, 42 Pa.C.S. § 9711(d)(10); and (2) appellant had committed another murder at the time of the offense, id., § 9711(d)(11). As to Lisa, the jury found three aggravating circumstances: (1) appellant was convicted of another offense for which a sentence of life was imposable, id., § 9711(d)(10); (2) appellant had committed another murder at the time of the current offense, id., § 9711(d)(11); and (3) Lisa was a witness to a murder committed by appellant and was killed for the purpose of preventing her testimony in any criminal proceeding involving such offenses, id., § 9711(d)(5). As to Avery, the jury found four aggravating circumstances: (1) appellant had been convicted of another offense for which a sentence of life imprisonment could have been imposed, id., § 9711(d)(10); (2) appellant had been convicted of another murder that was committed before or at the time of the offense at issue, id., § 9711(d)(11); (3) Avery was a witness to a murder and was killed to prevent her testimony in any criminal proceeding concerning the offense, id., § 9711(d)(5); and (4) Avery was a child less than 12 years of age at the time of her murder, id., § 9711(d)(16). The jury also determined each murder had one mitigating circumstance; appellant was under the influence of extreme mental or emotional disturbance at the time of the murders, caused by his father's recent Alzheimer's diagnosis. See id., § 9711(e)(2). On those findings, the jury found the aggravating circumstances outweighed the mitigating circumstances, and returned three consecutive death sentences for the 2005

murders. This Court affirmed on direct appeal, Commonwealth v. Eichinger, 915 A.2d 1122 (Pa. 2007), and the United States Supreme Court denied certiorari, Eichinger v. Pennsylvania, 552 U.S. 894 (2007).

Three weeks later, the Federal Community Defender Office (FCDO) filed a motion in the United States District Court for the Eastern District of Pennsylvania seeking appointment as federal habeas counsel in this case. Once appointed, the FCDO obtained a stay of the federal habeas proceeding. At about the same time, appellant filed a pro se PCRA petition in state court naming the FCDO as his counsel. The FCDO subsequently filed an amended petition on his behalf raising 27 claims of error, each with numerous sub-issues. The PCRA court held 22 days of evidentiary hearings. The FCDO presented testimony of prior counsel, appellant, five mental health experts, and 14 other witnesses. In rebuttal, the Commonwealth presented two mental health experts. Following final argument, the PCRA court dismissed appellant's petition in a 129-page opinion. PCRA Court Opinion, 7/25/12, at 129. Appellant presents 12 issues for this Court's review:

I.      Was [a]ppellant denied a full and fair PCRA proceeding?

II.      Was [a]ppellant denied effective assistance of counsel because trial counsel failed to investigate factual defenses, legal defenses, or whether [a]ppellant was able to make a knowing, intelligent and voluntary waiver prior to [a]ppellant's jury waiver and stipulated bench trial?

III.      Did trial counsels' ineffective failure to investigate, prepare and develop the defense case in order to give [a]ppellant the benefit of counsels' full and careful advice result in [a]ppellant's uninformed agreement to a stipulated "trial" where he did not contest the charges and failed to present a defense?

IV.      Was the trial court's colloquy securing [a]ppellant's waiver of his right to a jury trial and his right to contest the evidence against him constitutionally insufficient and were all prior counsel ineffective for failing to object to this colloquy?

V.  Were the statements introduced against [a]ppellant at trial unconstitutionally obtained, should the evidence seized based on these statements have been suppressed, and were prior counsel ineffective for failing to investigate and litigate these claims?

VI.  Was [a]ppellant denied effective assistance of counsel because trial counsel failed to investigate, develop and present substantial mitigating evidence?

VII.  Did the prosecutor improperly inject future dangerousness into [a]ppellant's trial during cross[-]examination of [a]ppellant's mental health expert; and was [a]ppellant denied effective assistance of counsel because trial counsel failed to prevent this?

VIII.  Was [a]ppellant denied effective assistance of counsel because trial counsel failed to effectively cross-examine Commonwealth witness Timothy Michals?

IX.  Was the prosecutor's closing argument in the penalty phase grossly improper and was [a]ppellant denied effective assistance of counsel because trial counsel failed to object and raise these instances of improper argument, in violation of [a]ppellant's constitutional rights?

X.  Did the penalty phase jury instructions deprive [a]ppellant of a constitutionally reliable sentence in multiple respects and did prior counsel ineffectively litigate these errors, in violation of [a]ppellant's constitutional rights?

XI.  Are [a]ppellant's death sentences unconstitutional because the sentencing jury's ability to consider and give effect to the relevant mitigating evidence was impaired, violating his constitutional rights, and was [a]ppellant denied effective assistance of counsel because all prior counsel failed to raise this claim?

XII.  Was [a]ppellant denied due process, reliable sentencing and effective assistance of counsel because of the cumulative prejudicial effect of all errors described in [appellant's b]rief?

Appellant's Brief, at 1-2.

"[A]s a general proposition, we review a denial of PCRA relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." Commonwealth v. Dennis, 17 A.3d 297, 301 (Pa. 2011) (citation omitted). A PCRA court's credibility findings are to be accorded great deference, and where supported by

the record, such determinations are binding on a reviewing court. Id., at 305 (citations omitted). Before addressing each of appellant's particular claims of error, we note that many of them rely on his assertion he suffers from cognitive impairment, incompetency, and mental illness. Much of the 22 days of evidentiary hearings on appellant's PCRA petition was dedicated to his mental health. The PCRA court listened to mental health experts from both sides and found none of appellant's evidence compelling. PCRA Court Opinion, 7/25/12, at 2-3. It further found appellant "was competent, did not suffer from any cognitive limitations and … was not brain damaged either at the time of the murders or at the time of trial." Id. Those findings are consistent with record testimony, and therefore binding on this Court.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

With the exception of issue I, which we save for last for ease of explanation, each of appellant's issues criticizes the effectiveness of his trial counsel. To obtain relief under the PCRA, the conviction or sentence must have resulted from one or more of the errors specifically enumerated in 42 Pa.C.S. § 9543(a)(2), including ineffective assistance of counsel. Id., § 9543(a)(2)(ii). To establish ineffective assistance of counsel, a petitioner must demonstrate, by a preponderance of the evidence, that: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or omission; and (3) there is a reasonable probability that the result of the proceeding would have been different absent such error. Commonwealth v. Chmiel, 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from Commonwealth v. Pierce, 527 A.2d 973, 975-76 (Pa. 1987)).[4] If a petitioner fails to satisfy any prong of the

---

[4] Pierce reiterates the preexisting three-prong test for ineffective assistance of counsel in Pennsylvania and holds it to be consistent with the two-prong performance and prejudice test provided by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Pierce, at 976-77.

ineffectiveness inquiry, a claim of ineffective assistance of counsel will be rejected. Commonwealth v. Sattazahn, 952 A.2d 640, 653 (Pa. 2008) (citation omitted). As explained in detail below, each of appellant's ineffective assistance claims fails on one or more of the elements of the Pierce test.

## A. Ineffectiveness Based on Counsel's Failure to Contest Trial Error

Issues IV, V, VII, VIII, IX, X, and XI contest prior counsel's effectiveness in litigating supposed trial errors. As explained more thoroughly below, each of these claims fails on the first element of the Pierce test because there is no merit to the underlying claims — there was no actual error; therefore, counsel cannot be deemed ineffective for failing to contest it. See Commonwealth v. Washington, 927 A.2d 586, 603 (Pa. 2007) ("Counsel will not be deemed ineffective for failing to raise a meritless claim.").

## Issue IV: Effectiveness of Appellant's Waiver of Rights to Jury Trial and to Contest Evidence

Appellant waived his right to a guilt phase jury after thorough oral and written colloquies. N.T. Trial, 10/18/05, at 4-8. He orally affirmed he understood he had a right to a jury trial, the jury would be comprised of members of the community, he would participate in the selection of the jury, and in order to be convicted each member of the jury must be convinced of his guilt beyond a reasonable doubt. Id., at 5-6. He also reviewed and signed a written jury waiver form, which reiterated the rights already explained to him. Id., at 4-5. He repeatedly affirmed he understood the written form and the rights explained to him by the court, and that he had not suffered from any mental illness capable of impairing his ability to understand the proceedings. Id., at 7.

Appellant argues the trial court's colloquy securing the waiver of his right to a guilt phase jury and his right to contest the evidence against him was constitutionally

insufficient, and all prior counsel were ineffective for failing to object to it. Neither argument has merit.

Appellant concedes the jury waiver colloquy satisfied the Pennsylvania standard for a knowing, intelligent, and voluntary jury trial waiver. See Commonwealth v. O'Donnell, 740 A.2d 198, 208 (Pa. 1999) (citation omitted) (essential ingredients of jury trial waiver colloquy are requirements that jury be chosen from members of community (jury of one's peers), that verdict be unanimous, and that accused be allowed to participate in selection of jury panel). However, he argues the Pennsylvania standard is insufficient to satisfy federal constitutional requirements because it does not ensure a criminal defendant's waiver is an "intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). He argues a jury finding each fact necessary to prove the elements of the crime charged, and to testify on his own behalf are both rights due to a criminal defendant. He therefore argues the trial court's colloquy securing his guilt phase jury waiver was constitutionally insufficient for failing to advise him concerning these additional rights.

Appellant's argument fails at the outset because it is built upon the faulty premise a colloquy is constitutionally required to give effect to a defendant's jury trial waiver. Pennsylvania requires an on-the-record colloquy, see Pa.R.Crim.P. 620, but the rule is merely a prophylactic measure. "A [jury trial] waiver colloquy is a procedural device; it is not a constitutional end or a constitutional right." Commonwealth v. Mallory, 941 A.2d 686, 697 (Pa. 2008) (internal quotations omitted). That which is not constitutionally required cannot be constitutionally defective.

Appellant's argument that the colloquy was constitutionally insufficient to secure his decision to stipulate to the evidence is also meritless. A colloquy ensuring a knowing and voluntary decision is required any time a defendant stipulates to evidence that

virtually assures his conviction because such a stipulation is functionally the same as a guilty plea.  See Commonwealth v. Davis, 322 A.2d 103, 105 (Pa. 1974).

> In order for a guilty plea to be constitutionally valid, the guilty plea colloquy must affirmatively show that the defendant understood what the plea connoted and its consequences. This determination is to be made by examining the totality of the circumstances surrounding the entry of the plea. Thus, even though there is an omission or defect in the guilty plea colloquy, a plea of guilty will not be deemed invalid if the circumstances surrounding the entry of the plea disclose that the defendant had a full understanding of the nature and consequences of his plea and that he knowingly and voluntarily decided to enter the plea.

Commonwealth v. Yeomans, 24 A.3d 1044, 1047 (Pa. Super. 2011) (quoting Commonwealth v. Fluharty, 632 A.2d 312, 314-15 (Pa. Super. 1993)).

Guided by these principles, our review of the colloquy leads us to conclude it was more than sufficient to show appellant understood the nature of stipulating to the evidence and that doing so could expose him to the death penalty.  The trial court thoroughly questioned appellant, walking him step-by-step through the procedure for a stipulated trial, and he testified he understood at every point along the way.  N.T. Trial, 10/18/05, at 4-22.  Specifically, appellant answered in the affirmative to the following questions from the trial court:

> I understand that you have authorized your attorneys to not contest [the] trial and offer no defense to the four charges of first-degree murder and related offenses.   This means that you will not be confronting the witnesses against you, and you are giving up your right to cross-examine those witnesses and to otherwise seek to impeach their testimony. … Do you understand that?
>
> \*     \*     \*
>
> This means that you will be exposed to the death penalty.  That a penalty-phase only jury will be selected, and that jury will be told by your attorney that you did not contest and offered no defense to the first-degree murder charges in the guilty or not guilty proceedings.   They will then argue these facts as mitigation.   Do you understand this and agree to it?

Id., at 9-10. The trial court explained the law on murder, and appellant replied he understood the law as explained. Id., at 11-15. The trial court asked appellant, "Now then, do you understand the charges that you are [faced with] today and the possible penalties?" Appellant replied that he did. Id., at 15. The trial court, with the prosecutor's assistance, described the other crimes with which appellant was charged and their penalties. Id., at 15-18. The trial court stated, "[A]ll the penalties could be imposed consecutively. Do you understand that?" Id., at 18. Appellant responded he did. Id.

> The trial court then asked:
>
> You understand that by waiving a jury trial and proceeding in accordance with the advice of your attorneys, that you will be found guilty beyond a reasonable doubt of four counts of first-degree murder and related offenses. Do you understand that?

Id. Appellant replied he understood. Id. To be sure, the trial court asked him again, "You understand and agree to that?" Id. Appellant said yes again. Id., at 19. The trial court then asked, "And you understand the consequences of your decision today?" Id. Appellant said yes. Id. The trial court then went through the procedure of the prospective capital sentencing hearing. Id. Appellant replied yes every time the court paused to ask if he understood what was explained. The trial court gave appellant an opportunity to ask questions; he declined. Id. Once the trial court finished its colloquy, trial counsel examined appellant on the record. Trial counsel asked whether appellant understood the juries would be dismissed, whether he and trial counsel had reviewed the rights implicated by the trial court's colloquy prior to coming to court, whether appellant had understood those rights, and whether he had any questions. Id., at 20-21. Appellant replied yes to every question and declined to ask further questions. Id.

The trial court's colloquy was exhaustive. Appellant was not under the influence of an intoxicant or mental defect that inhibited his ability to meaningfully participate in, or understand the colloquy. See id., at 7. There is no merit to the argument the process used to secure appellant's guilt phase jury waiver, or the process by which appellant elected to stipulate to the evidence, was constitutionally defective. Accordingly, counsel cannot be deemed ineffective regarding this issue. See Washington, at 603.

### Issue V: Admission of Appellant's Statements

Appellant alleges the statements used against him at trial[5] were unconstitutionally obtained and counsel was ineffective for failing to contest the admission of his statements and all evidence obtained therefrom. First, appellant contends the police violated his Sixth Amendment right to an attorney when they took his March 28, 2005, confession in the absence of counsel after the prosecution against him had already commenced. Second, he argues his waiver of his right to remain silent was ineffective as to all of his confessions because his impaired mental health prevented it from being knowing, intelligent, and voluntary.

Appellant gave three written statements to police during their first interview at his workplace at the Somers Point Acme market in New Jersey on March 25-26, 2005. On the evening of March 25, after an initial interview in which appellant made a false

---

[5] The statements presented at trial included:

(1) a 12 page statement given by [a]ppellant at the Somers Point Acme in New Jersey on March 25, 2005 [CS-4], (2) pages 13 through 20 of the Somers Point Acme statement made on March 25, 2005 [CS-6], (3) an 8 page statement given at the Somers Point Acme on March 26, 2005 [CS-7,] and (4) a 9 page statement given by [a]ppellant at the Upper Merion police department on March 28, 2005 [CS-11].

PCRA Court Opinion, 7/25/12, at 60 (footnote omitted).

statement, the police confronted him with the evidence against him, and he confessed. He was arrested and given Miranda[6] warnings, but continued to participate in the interview, eventually signing the two written inculpatory statements at issue. Because March 26 was a Saturday, the police decided not to transport appellant back to Pennsylvania over the weekend. Instead, sometime after the interview concluded in the early hours of March 26, they brought appellant before a New Jersey magistrate as a fugitive from justice, and he was detained in a local prison in Atlantic County, New Jersey over the weekend. On the morning of March 28, 2005, appellant appeared before another local magistrate and waived extradition. The police then transported appellant back to Montgomery County, Pennsylvania, where he was set to appear at a preliminary arraignment. In transit, police reissued appellant his Miranda warnings and asked him additional questions. Appellant gave additional inculpatory statements in response to those questions, but police were not able to record those statements while in the moving car. On arrival in Pennsylvania, police took appellant immediately to his preliminary arraignment. Thereafter, they took appellant back to the police station for processing and fingerprinting. At that point, they typed up appellant's statements from the car, which he signed.

Appellant argues at least one of his three appearances before a judicial officer between March 26-28 caused his Sixth Amendment right to counsel to attach, and any statements elicited from him by the police thereafter were unconstitutionally obtained. Regardless of whether appellant's statements were unlawfully obtained, trial counsel was not ineffective for failing to raise those claims because trial counsel did, in fact, raise them. Although trial counsel never mentioned the words "Sixth Amendment," and used New Jersey case law because that is where appellant was detained, questioned, and

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

appeared before the magistrate, counsel clearly argued at the suppression hearing that appellant's statements to the police during his transport to Pennsylvania should have been suppressed for violating his right to counsel. N.T. Pre-trial Motions, 9/15/05, at 92-94. Accordingly, this ineffectiveness claim fails.

Appellant's Miranda argument also lacks merit. On direct appeal, we decided the statements in question were voluntary and therefore admissible. Eichinger, at 1131-36. In his PCRA petition, appellant alleges counsel was ineffective for failing to contest the statements on mental health grounds. He avers these issues are distinct, and therefore this issue was not previously litigated.

The issues are not distinct. A defendant's mental state, including his mental health, is at the heart of the voluntariness inquiry. See Commonwealth v. DeJesus, 787 A.2d 394, 403 (Pa. 2001) (citation omitted) (test for determining voluntariness of confession and validity of waiver looks to totality of circumstances, including defendant's physical and psychological state). Since we have already decided the voluntariness of appellant's confession, we have also impliedly decided the impact his alleged mental health problems may have had on the voluntariness of his Miranda waiver.

Even if the distinction was valid, the argument lacks merit. As we discussed supra, the record supports the PCRA court's finding appellant suffered from no meaningful mental defect at any time relevant to this case. Therefore, that finding is binding on this Court. If appellant was not suffering from a mental defect, trial counsel could not have been ineffective for failing to contest the admissibility of his confessions on that basis.

### Issues VII & IX: Prosecutorial Misconduct

In issue VII, appellant argues the prosecutor engaged in misconduct during his questioning of Dr. Gillian Blair, a defense expert witness, and then used Dr. Blair's

testimony to make an improper argument during his closing argument. He further argues trial counsel was ineffective for failing to object to the misconduct and improper argument. During the penalty phase, Dr. Blair testified about tests she performed on appellant to diagnose his supposed psychological disorders. See N.T. Sentencing, 11/2/05, at 44-62. On cross-examination, the following exchange took place between the prosecutor and Dr. Blair:

> Q. On the last page of your report there is a sentence which reads, "He has poor coping skills and is susceptible to decompensation at times of heightened stress." In other words, when he's under stressful situations, bad stuff might happen.
>
> A. Right.
>
> Q. Including killing people, right?
>
> A. Well, certainly he has very poor coping skills, and when he is very, very stressed he will decompensate and will not be able to control his behavior.
>
> Q. Which might result in murdering people, right?
>
> A. Absolutely.
>
> Q. And you can't tell this jury what it is we should look for to make sure that he doesn't decompensate and kill someone else, can you?
>
> A. No.

Id., at 83. During his closing argument, the prosecutor made this comment:

> Do you remember when I cross-examined Dr. Gillian [sic]. She said that when the defendant is under stress, he might tend to decompensate. And I said, [t]hat means when when something bad happens in his life, he might kill people, right? And she said yes. And I said, [y]ou can't tell us what to look for so that we'll know when he is about to kill somebody in the future. You're right I can't.
>
> How many more people must die at this man's hands? Is it going to be a nurse [in] prison? A doctor? An inmate? A guard? A visitor? How many more people must die at this man's hands?

N.T. Sentencing, 11/3/05, at 24-25.  Appellant argues this cross-examination of Dr. Blair and the closing argument derived from her responses constitute prosecutorial misconduct because they were misleading, irrelevant, and unfairly prejudicial.  In support, appellant cites Commonwealth v. Marrero, 687 A.2d 1102, 1108 n.19 (Pa. 1996), for the proposition a death sentence cannot be based on future dangerousness because it is not a statutory aggravating circumstance.

In Simmons, a plurality of the United States Supreme Court held "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."  Simmons, at 156.  Future dangerousness is not an enumerated aggravating circumstance in Pennsylvania, see 42 Pa.C.S. § 9711(d), and, unlike the statutory aggravating circumstances, it may not be used by a jury as the sole reason for imposing a death sentence.  See Marrero, at 1108 n.19.  While "[i]t is not per se error for a prosecutor to argue a defendant's future dangerousness," Commonwealth v. Smith, 995 A.2d 1143, 1163 (Pa. 2010), where future dangerousness is at issue and a capital defendant requests a specific instruction that his first degree murder conviction precludes his eligibility for parole, it is a denial of due process to refuse that instruction, see Commonwealth v. Chambers, 685 A.2d 96, 106 (Pa. 1996).  Thus, a prosecutor is permitted to discuss a defendant's future dangerousness during rebuttal, after a defendant places his future conduct at issue.

Here, appellant injected his future dangerousness into the penalty phase through the testimony of a correctional counselor, who stated appellant conformed to the correctional facility's regulations.  See N.T. Sentencing, 11/2/05, at 6.  This testimony opened the door for the prosecution to explore appellant's conformance and was therefore a "fair response" to appellant's argument regarding his status as a model

prisoner. See Marrero, at 1109; see also People v. Brady, 236 P.3d 312, 342 (Cal. 2010) ("The prosecutor's argument concerning defendant's dangerousness in prison was proper rebuttal of an expert witness's testimony about defendant's ability to function in a highly structured environment.").

It is well established that "a prosecutor is free to present his argument with logical force and vigor so long as there is a reasonable basis in the record for the prosecutor's remarks." Commonwealth v. Busanet, 54 A.3d 35, 64 (Pa. 2012) (citation omitted). This Court recently held a similar statement made during closing arguments was permissible. See Commonwealth v. Cam Ly, 980 A.2d 61, 93-95 (Pa. 2009).[7] While we acknowledge the prosecution's statement here was a step beyond the statement in Cam Ly, this Court has set a high bar for reversal on grounds of prosecutorial misconduct where the trial court has issued appropriate instructions. Moreover, in light of the compelling aggravating circumstances and appellant's failure to present convincing mitigating evidence on post-conviction review, we conclude appellant is not entitled to relief on this claim.

---

[7] The statement held to be permissible was made by a prosecutor during closing arguments:

> You … know the past history of Cam Ly and the fact that he has committed violent acts on a number of occasions in the past. Will you be satisfied with the sentence of life imprisonment? Or do you believe death is necessary … for the protection of all of us[?]

Id.

In issue IX, appellant attacks several other arguments made by the prosecutor in his penalty phase opening statement and summation. However, none of the arguments appellant takes exception with were remotely objectionable.

"A prosecutor has great discretion during closing argument; indeed, closing 'argument' is just that: argument." Commonwealth v. Brown, 911 A.2d 576, 580 (Pa. Super. 2006). "[T]he prosecutor must limit his argument to the facts in evidence and legitimate inferences therefrom." Commonwealth v. Gilman, 368 A.2d 253, 257 (Pa. 1977) (citation omitted). However, the prosecutor "must have reasonable latitude in [fairly] presenting [a] case [to the jury,] and must be free [to present] his [or her closing] arguments with logical force and vigor." Commonwealth v. Johnson, 533 A.2d 994, 996 (Pa. 1987) (citation omitted) (internal quotations omitted). Therefore, "[c]omments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in the jurors' minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict." Commonwealth v. Bryant, 67 A.3d 716, 727 (internal markings and citations omitted).

Appellant begins by arguing, without citation, "[t]he prosecutor's duty to avoid improper argument applies with particular force to the penalty phase of a capital case." Appellant's Brief, at 64. Actually, the law states quite the opposite: "A prosecutor has more latitude in presenting argument at the penalty phase since the presumption of innocence no longer applies." Commonwealth v. Bridges, 757 A.2d 859, 880 (Pa. 2000) (citation omitted). Even if that were not the case, the arguments of which appellant complains were completely acceptable under the circumstances.

First, appellant takes issue with the prosecutor emphasizing his role as a representative of the state and, claiming the prosecutor expressed his personal belief that

seeking death was required by his oath of office. Specifically, appellant takes issue with the following remark:

> Members of the jury, for twenty years I have stood in courtrooms, this one and others, and asked jurors to do justice between the Commonwealth and someone who committed a foul crime, usually a murder. Every time I do that I am reminded of the awesome responsibility that is given to us by the people to represent them in cases of this sort. I do that and I do it willingly. When I became an Assistant District Attorney and then later as District Attorney, I put my hand on the Bible and swore I would protect the citizens of this country, and it is because I swore those oaths that I stand before you today.

N.T. Sentencing, 11/3/05, 7-8. Appellant argues such language wrapped the prosecutor in the cloak of state authority. However, he cites no authority for that proposition and fails to make a logical argument regarding how the comment was unfairly prejudicial. It is even less prejudicial in light of what was said next, which appellant declined to quote:

> But, members of the jury, I am not the only one here who took an oath. Each of you actually twice took an oath. Last week you swore that you would answer truthfully the questions that we put to you to determine whether you would be seated in one of those chairs. Do you remember that? … Well, you know last week when a judge of the Court of Common Pleas of Montgomery County, in his robe, on the bench, and then the District Attorney of this county asked you if the law required you to impose the death penalty, you all said you would follow the law.

Id., at 8. Read together, these passages can only be characterized as the prosecutor reminding the jury of his duties and its obligation to sentence appellant according to the law, rather than emotion. Thus, when read in context, there is nothing objectionable about the comment.

Next, appellant takes issue with the following language from the prosecutor's closing statement:

> Remember I told you in my opening to look at everything in this case through two prisms. Remember? The first that he is a malicious killer; hardness of heart, cruelty, wickedness, and that you should consider everything that is said knowing that as a fact. Make no mistake. There is

no chance that an innocent man is seated there. No chance. And there is no chance that we are asking you to sentence an innocent man to death. He is a malicious killer and everything you heard has to be viewed knowing that as a fact.

                              *       *       *

Conscious, malicious, volitional decision to murder her. If I can't have her, no one can. He murdered these people maliciously; in other words, with a stone rock-hard heart, wickedness of disposition, evilness and a complete and utter indifference to the value of human life.

Id., at 15, 26. Appellant contends these arguments, along with the prosecutor's reading of passages from appellant's own journal in which he memorialized the murders, id., at 21-24, urged the jury to find and weigh non-statutory aggravating factors such as maliciousness, wickedness, the victims' fear, the number of times each victim was stabbed, the manner in which each was stabbed, and his amusement about the crimes as recorded in his journal. He cites Marrero and Commonwealth v. Fisher, 681 A.2d 130, 146 (Pa. 1996), for the proposition that Pennsylvania capital sentencing juries are not permitted to consider such non-statutory aggravating circumstance.

Appellant's characterization of these comments as urging a finding of non-statutory aggravating factors is wholly irrational. "A prosecutor does not engage in misconduct when his statements are based on the evidence or made with oratorical flair." Commonwealth v. Carson, 913 A.2d 220, 237 (Pa. 2006) (citing Commonwealth v. Marshall, 633 A.2d 1100, 1110 (Pa. 1993)). The prosecutor's comments were merely a review of evidence properly admitted into the record and were within permissible characterization of the facts proven by that evidence.

Next, appellant takes issue with the Commonwealth's numerous arguments offered to contradict his mitigation evidence. Specifically, he protests the following statements from the prosecutor's closing argument:

[T]here is no mitigation in this case. There is no mitigation in this case.

\* \* \*

And all of the psycho-babble you heard from the defense psychiatrists, that ought to a scream [sic] at your common sense and say, Hey, wait a minute, that's nonsense…. That is all nonsense and you should consider it as complete and utter nonsense.

\* \* \*

Now, in addition to the psycho-babble the defense asked you to find as mitigation, the defense is asking you to consider that he is an Eagle Scout and that he managed to graduate from high school and that his father has a terrible disease, and I don't know, he loves his dog. I don't know what it is. Everybody, members of the jury, has things in their lives that they would rather were not there and everybody has things in their lives that they have done that are achievements. But that is not mitigation of sentence, members of the jury. That can't possibly be considered a reasonable thing to mitigate, that tends to make these killings less severe than they are. I suggest to you that that is the last vestige of the scoundrel. Well, I'm not such a bad guy because I love my mother and I graduated from high school and I worked for Acme. Come on. That is complete and utter nonsense and you should treat it as such.

N.T. Sentencing, 11/3/05, at 10, 12-3, 16. Appellant argues these comments offend rulings from the United States Supreme Court that any aspect of a defendant's character proffered as a basis for a sentence less than death should be considered as a mitigating factor, see Lockett v. Ohio, 438 U.S. 586, 604 (1978), and that there need not be any nexus between a defendant's mitigation and the crime, see Tennard v. Dretke, 542 U.S. 274, 289 (2004).

Appellant grossly mischaracterizes the cited cases. Those cases hold evidence relevant to a defendant's character must be admitted in a capital sentencing if a defendant offers it. In no way do those cases say the jury is required to give it any weight, or that the Commonwealth is not permitted to argue against it or produce contrary evidence. It is well settled "[a] prosecutor may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor." Chmiel, at 1185.

That is precisely what the prosecutor did with the comments about which appellant now complains.

Last, appellant takes issue with the prosecutor's arguments against the jury having mercy on appellant, specifically, "He is already trying to create and manufacture some sympathy from you. The psychiatric evidence. That should really, really offend you." N.T. Sentencing, 11/3/05, at 10-11. Appellant argues the comment was improper because a sentencing jury must be free to consider mitigating evidence and show mercy to the defendant. He cites no authority in support of the argument, and in fact, it has no merit. A prosecutor is allowed to argue that a sentencing jury in a capital case should show no mercy. See Chmiel, at 1184.

There is no merit to any of appellant's critiques of the prosecution's closing statements. All the arguments appellant takes issue with were based on facts in evidence, and none were unfairly prejudicial. Since none of the arguments appellant highlights were objectionable, trial counsel cannot be deemed ineffective for failing to object. See Washington, at 603-04.

**Issue VIII:   Cross-Examination of Commonwealth Witness Dr. Timothy Michals**

Appellant argues trial counsel was ineffective for failing to contest several flaws in the expert psychiatric testimony of Commonwealth witness Dr. Timothy Michals. First, he argues Dr. Michals committed a violation of the ethics rules of the psychiatric profession by opining on appellant's mental state at the time of the murder without qualifying his comments by revealing he had never personally examined appellant. Appellant further argues Dr. Michals misinformed the jury as to what constitutes mitigating circumstances.

Appellant argues Dr. Michals was bound by the rules of the psychiatric profession before testifying regarding appellant's mental health. This argument fails on numerous

levels. First, appellant cites no authority; he does not cite the ethics rule of the psychiatric profession Dr. Michals supposedly violated, and he cites no legal authority for the proposition that such a violation renders his testimony inadmissible. The reason appellant is unable to provide citation in support of his argument is because none exists. An extensive search of authority from all United States jurisdictions reveals none in support of the proposition a violation of the ethics rules for an expert witness's profession is objectionable. This Court is no authority on the ethical constraints of the psychiatric profession, so we cannot comment on Dr. Michals's supposed ethical violation. However, assuming such a violation did occur, it has no bearing on the admissibility of Dr. Michals testimony. That Dr. Michals had never personally examined appellant is a fact that may have legitimately degraded the weight of his testimony. Trial counsel recognized as much and cross-examined him on it. N.T. Sentencing, 11/2/05, at 175-76. In doing so, they satisfied their obligation to challenge his testimony.

Appellant further argues Dr. Michals misled the jury as to what constitutes mitigation evidence. Appellant first complains Dr. Michals wrongly claimed the extreme mental or emotional disturbance mitigator, 42 Pa.C.S. § 9711(e)(2), did not apply because such distress was not present during the Jennifer Still homicide, the non-capital offense. Specifically, he takes issue with the following testimony from Dr. Michals's direct examination:

Q. Do you agree with Dr. Weiss that there are two mitigating factors shown by [appellant's] testing and analysis?

A. I don't think there are any mitigating factors. Under extreme emotional distress, the first killing, he was able to postpone for 24 hours, then he acted. So he had an intent and plan. There was a reason for his postponing that first killing. I don't think that is a mitigating factor.

N.T. Sentencing, 11/2/05, at 174-75.

The argument lacks merit. Appellant has cherry-picked testimony to support a specious argument. Immediately after the testimony cited above, Dr. Michals continued:

> There are three deaths in the second charge, in which basically the first was the assault of the first victim, the second victim and third victim, and they were killed in reverse order. They were killed by slashing their throats, causing exsanguination, which is the cause of death there.
>
> I think my opinion, which I express with a reasonable degree of psychiatric certainty, is that he had substantial capacity. He knew what he was doing, and he just acted despite the knowledge that his actions were taking the lives of these three people.

Id., at 175. When Dr. Michals's response is read in its entirety, it is reasonably clear he was examining appellant's behavior in both sets of murders in order to conclude appellant had substantial capacity in both. That appellant had substantial capacity in the first murder was not necessarily relevant to the sentencing proceedings for the latter three, but it was not prejudicial either. The jury had already heard the trial court's opening instructions in which it was explicitly told its decision between death and life imprisonment only applied to the latter three murders and not to the murder of Jennifer Still. N.T. Sentencing, 11/1/05, at 16-17. Therefore, there is little chance the jury was confused by Dr. Michals's testimony. Even if there was confusion, it was cured when the trial court instructed the jury in accordance with the Pennsylvania capital sentencing statute, 42 Pa.C.S. § 9711(c), prior to closing statements, as discussed further below.

Appellant also argues Dr. Michals confused the jury by mistakenly claiming the mental-state mitigator outlined in 42 Pa.C.S. § 9711(e)(2)-(3) only pertains to a defendant's mental state at the time of his offense. Specifically, he takes issue with Dr. Michals's comment that, "the mitigating factors have to do with mental state at the time of the commission of the crime." N.T. Sentencing, 11/2/05, at 185.

Appellant's argument lacks merit for numerous reasons. First, Dr. Michals's statement was accurate — the two mitigating factors from Pennsylvania's death penalty

statute dealing with a defendant's mental state pertain to his mental state at the time of the offense. See 42 Pa.C.S. § 9711(e)(2)-(3)[8]; Commonwealth v. Rice, 795 A.2d 340, 354-55 (Pa. 2002) (citations omitted) (discussing extreme emotional distress mitigator); Commonwealth v. Henry, 569 A.2d 929, 939-40 (Pa. 1990) (discussing impaired-capacity mitigator). While the "catch-all" mitigator permits a defendant to introduce evidence of his good character throughout his life or any unique aspect of his crime to off-set evidence of one or more of the statutory aggravating circumstances, see 42 Pa.C.S. § 9711(e)(8), Dr. Michals's comment cannot reasonably be read as addressing the nuances of that mitigator. Read in the context of Dr. Michals's other responses to questions asked moments prior — language appellant conveniently omits — it is clear the comment was directed at the statutory mitigators dealing specifically with a defendant's mental state.

Appellant's argument also lacks merit because the trial court fully and accurately explained the process the jury was to use in determining whether to return death sentences during its jury instructions. If the jury was confused by Dr. Michals's comment, however unlikely that may be, the confusion was cured by the instructions issued in accordance with 42 Pa.C.S. § 9711(c), as discussed below.

---

[8] 42 Pa.C.S. § 9711(e) states, in relevant part:

Mitigating circumstances shall include the following:

* * *

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

Id.

Also, it is unlikely the jury relied on Dr. Michals's interpretations of the law, as the trial court had already instructed it, "Now, as the trial judge, it is <u>my</u> responsibility to decide all questions of law. …. You should consider all of my instructions taken together as a connected series, because [they] constitute the law which you are obligated by your oath to follow." N.T. Sentencing, 11/1/05, at 19-20 (emphasis added).

There is no merit to any of appellant's complaints about Dr. Michals's testimony. Therefore, trial counsel cannot be deemed ineffective for failing to make the objections appellant suggests. <u>See</u> <u>Washington</u>, at 603-04.

### Issue X: Penalty Phase Jury Instructions

Appellant argues the penalty phase jury instructions were constitutionally deficient, and trial counsel was ineffective for failing to properly litigate challenges to the defects. At the outset, we note appellant fails to cite any legal authority for his various complaints about the jury instructions. Accordingly, his claims fail. <u>See</u> Pa.R.A.P. 2119.

Appellant first argues the jury instructions were improper for not including an instruction that life in prison is presumed to be the appropriate punishment for capital murder. He argues the jury instructions given "adopted a structural primacy for death over life[.]" Appellant's Brief, at 68. Appellant's argument is unreasonable.

> It may be acknowledged that in some sense there is a "presumption of life"—this from the fact that the prosecution is limited to specific aggravating circumstances which must be proven beyond a reasonable doubt, while the defendant is permitted great latitude in demonstrating mitigating circumstances, and then by the lesser preponderance standard.

<u>Eichinger</u>, at 1137 (quoting <u>Commonwealth v. Travaglia</u>, 467 A.2d 288, 300-01 (Pa. 1983)). However, a specific jury instruction containing the words 'presumption of life' is not required. <u>Id.</u>, at 1138. "An explanation of the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof and a

clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey the fact that life is presumed."   Id.

In this case, trial counsel asked for a jury instruction with the specific words "presumption of life."   N.T. Pre-trial Motions, 10/31/05, at 3-5.   The trial court rejected that phrasing, id., at 23-24, but issued numerous, redundant, and clear instructions adequately outlining the proper procedures and standards for the jury's choice between life and death.   The trial court's opening instructions included the following:

> Now, in this sentencing trial evidence will be presented on the question of the sentence to be imposed, either death or life imprisonment.   Counsel may present additional evidence and make further arguments, and then you will decide whether to sentence the defendant to death or life imprisonment without parole.
>
> Your sentence will depend on what you find about aggravating and mitigating circumstances.   The sentencing code defines aggravating and mitigating circumstances, and I will explain these concepts to you in more detail later.
>
> Your verdict must be a sentence of death if you unanimously find, that is all of you find, at least one aggravating and no mitigating circumstance[s], or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.   If you do not all agree on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment.

N.T. Sentencing, 11/1/05, at 17.   The trial court reiterated and expanded upon those opening instructions when it charged the jury prior to its deliberation:

> First, … you must understand that your verdict must be a sentence of death, if and only if, you unanimously find, that is all of you find, at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances that outweigh any mitigating circumstance or circumstances.   If you do not all agree on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment without parole.
>
> The Commonwealth must prove any aggravating circumstance beyond a reasonable doubt.   This does not mean that the Commonwealth must

prove the aggravating circumstance beyond all doubt or to a mathematical certainty.

A reasonable doubt is the kind of doubt that would cause a reasonable and sensible person to hesitate before acting upon a matter of importance in his or her own affairs. A reasonable doubt must be a real doubt and may not be one that a juror imagines or makes up to avoid carrying out an unpleasant duty.

By contrast, the defendant must prove any mitigating circumstance; however, the defendant only has to prove it by a preponderance of the evidence, that is, by the greater weight of the evidence, which is a less demanding standard of proof than beyond a reasonable doubt. Facts are proven by a preponderance of the evidence when the evidence shows that it is more likely than not that the facts are true.

N.T. Sentencing 11/3/05, at 45-47. The court then proceeded to discuss, in detail, the criteria for each aggravating and mitigating circumstance that could possibly have applied to each of the three victims, reiterating the beyond a reasonable doubt standard for each possible aggravator and the preponderance of the evidence standard for each possible mitigator. Id., at 47-54. The court then gave a lengthy instruction on how the jury was to complete the verdict slip:

As I told you earlier, you must unanimously agree on one of two general findings before you can sentence the defendant to death. They are a finding that there is at least one aggravating circumstance and no mitigating circumstance, or a finding that there are one or more aggravating circumstances that outweigh any mitigating circumstance or circumstances.

In deciding whether aggravating outweigh mitigating circumstances, do not simply count the number. Compare the seriousness and importance of the aggravating with the mitigating circumstances. If you all agree on either one of the two general findings, then you can and must sentence the defendant to death.

When voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance [as] present, despite what other jurors may believe. This is different from the general findings to reach your ultimate sentence of either life in prison or death.

The specific findings as to any particular aggravating circumstance must be unanimous. All of you must agree that the Commonwealth has proven it beyond a reasonable doubt. That is not true for any mitigating circumstance. Any circumstance that any juror considers to be mitigating may be considered by that juror in determining the proper sentence.

This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives the defendant the full benefit of any mitigating circumstance or circumstances. It is closely related to the burden of proof requirement.

So remember, the Commonwealth must prove any aggravating circumstance beyond a reasonable doubt, while the defendant only has to prove any mitigating circumstance by a preponderance of the evidence.

Your final sentence, life imprisonment without parole, or death, must be unanimous. All of you must agree that the sentence should be life imprisonment or that the sentence should be death, because there is at least one aggravating circumstance and no mitigating circumstance, or because the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances found by any juror.

Now, if you do not agree unanimously on the death sentence and on one of the two general findings that will support it, then you have two immediate options. You may either continue to discuss the case and deliberate the possibility of a death sentence; or, if you all agree to do so, you may stop deliberating and sentence [appellant] to life imprisonment.

If you come to a point where you have deliberated conscientiously and thoroughly and still cannot all agree either to sentence [appellant] to death or to stop and sentence him to life imprisonment, you would report that to me. If it seems to me that you are hopelessly deadlocked, it will be my duty to sentence [appellant] to life imprisonment.

Id., at 56-59. Appellant's contention the instructions created a "primacy for death over life" is plainly unreasonable. Appellant's Brief, at 68. The instructions effectively explained how the jury was to come to a sentence of life imprisonment or death under the death penalty statute. See 42 Pa.C.S. § 9711(c).

Appellant next argues the trial court's preliminary jury instructions misled the jury because they informed the jury appellant had been convicted of first degree murder and described the elements of that offense, elaborating on the legal meaning of "malice,"

"specific intent," and "premeditation." Specifically, he protests the following language from the trial court's opening instructions:

> First degree murder in Pennsylvania is described as follows: First degree murder is murder in which the killer has the specific intent to kill.
>
> The following three elements have been proven previously beyond a reasonable doubt: First, that the particular victim is dead. Second, that [appellant] killed her. And third, that [appellant] did so with the specific intent to kill and with malice.
>
> Now, a person who kills must act with malice to be guilty of any degree of murder, and malice is what separates murder from manslaughter.
>
> The word malice as I am using it has a special legal meaning. It does not mean simply hatred, spite or ill will. Malice is a shorthand way of referring to any of three different mental states that the law regards as being bad enough to make a killing murder. Thus, a killing is with malice if the killer acts with, first, an intent to kill; second, an intent to inflict serious bodily harm; or third, a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life.
>
> Now, a person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention. As my earlier definition of malice indicates, a killing by a person who has the specific intent to kill is a killing with malice. Stated differently, a killing is with a specific intent to kill if it is willful, deliberate and premeditated, such as, but not limited to, by means of poison or by lying in wait.
>
> The specific intent to kill, including the premeditation needed for first degree murder, does not require planning or previous thought [f]or any particular length of time. It can occur quickly. All that is necessary is that there be time enough so that the defendant can and does fully form an intent to kill and is conscious of that intention.
>
> When deciding whether [appellant] had the specific intent to kill, the jury would consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind. If the jury believed that [appellant] intentionally used a deadly weapon on a vital part of the victim's body, the jury may regard that as an item of circumstantial evidence from which they may, if they choose, infer [appellant] had the specific intent to kill.

N.T. Sentencing, 11/1/05, at 25-27. Appellant further argues the prosecutor improperly referred to those instructions during his opening and closing statements. Specifically, he takes issue with the following language from the prosecutor's summation:

> There are two things that I want you to keep in mind when every witness testifies and when every piece of evidence is presented, two things, two prisms I want you to view this case through and all of the evidence that comes from the stand. Number one, that [appellant] is a malicious killer. Malice. You heard what the judge said. Wickedness of disposition. Hardness of heart. Cruelty. An extreme indifference to the value of human life. Wickedness. Another word for wickedness is evilness.
>
> So bear in mind, number one, the defendant is a malicious killer.

Id., at 40. Appellant contends if the trial court's instructions and the prosecutor's comments are read together, a reasonable juror would understand malice, specific intent, and premeditation to be aggravating circumstances weighing in favor of a death sentence.

Appellant's reading of the trial court's and prosecutor's comments is unreasonable. Neither the trial court nor the prosecutor ever stated malice, specific intent, or premeditation were aggravators for the purpose of capital murder sentencing, nor could that rationally be inferred from the trial court's opening instructions or the prosecutor's arguments. The trial court's instructions are clearly background information meant to orient the jury as it carried out its task. The prosecutor's comments are argumentation well within the bounds of permissible oratory, as discussed above. Even if appellant's characterization of the cited language was reasonable, any confusion the jury may have had was corrected by the trial court's clear and complete instruction quoted above.

Appellant argues the jury instructions misinformed the jury about the possibility of, and circumstances under which he might receive, a commutation of his sentence. He argues the trial court's statement, "I will tell you that the governor and the Board of

Pardons rarely commutes a sentence of life imprisonment," N.T. Sentencing, 11/3/05, at 62, implied there was a chance he would eventually be released and pose a threat to public safety if the jury did not issue a death sentence. Appellant also argues the trial court's instructions were incomplete because they did not include language from "Pennsylvania's death penalty instructions" stating, in effect, the jury can assume the Governor and Board of Pardons will not commute the life sentence of a prisoner they believe to be dangerous. Appellant's Brief, at 70. As appellant concedes, the trial court's statement about the frequency of commuted life sentences was factually correct in that since 1997, two people with life sentences have had those sentences commuted to a term of years. Furthermore, it cannot reasonably be read to suggest danger to the public should the jury forgo a death sentence; quite the opposite, it is only reasonably read as reassurance to the jury appellant would not pose a threat to safety regardless of its choice. The language appellant claims was missing from the jury instruction is from Pennsylvania Suggested Standard Criminal Jury Instruction 15.2502F. As the title implies, it is merely a suggestion, and the particular text to which appellant refers is further qualified as merely "optional" within that suggested instruction. The Suggested Standard Jury Instructions themselves are not binding and do not alter the discretion afforded trial courts in crafting jury instructions; rather, as their title suggests, the instructions are guides only. See Commonwealth v. Simpson, 66 A.3d 253, 274-75 (Pa. 2013) (citations omitted). Furthermore, counsel is not deemed ineffective for failing to object to a jury instruction given by the court where the instruction itself is justifiable or not otherwise improper. See Commonwealth v. Rainey, 928 A.2d 215, 243 (Pa. 2007). As none of appellant's complaints about the penalty phase jury instructions have any merit, trial counsel cannot be found ineffective. See Washington, at 603.

**Issue XI:   Sentencing Jury's Ability to Consider Mitigating Evidence**

Appellant argues his death sentences are unconstitutional because the sentencing jury's ability to consider and give effect to the relevant mitigating evidence was impaired. Specifically, he asserts three empaneled jurors interpreted the court's instructions to mean they could not consider mitigating circumstances if they found aggravating circumstances.   He avers the misunderstanding precluded the jury from considering the mitigating circumstances surrounding his crimes in violation of the Eighth and Fourteenth Amendments to the United States Constitution, as interpreted in <u>Lockett</u>, and corresponding provisions of the Pennsylvania Constitution.   Appellant also argues prior counsel were ineffective for failing to raise this issue.

There is no merit to this claim.   First, as the PCRA court properly noted, appellant's averment the jury did not consider mitigating circumstances because of some supposed confusion surrounding the jury instructions is patently false.   PCRA Court Opinion, 7/25/12, at 116.   The jury must have considered the mitigating circumstances of appellant's crimes because it recorded its finding of a mitigating circumstance on the verdict slip.   <u>See</u> Verdict Sheet, 11/3/05, at 3.

Next, <u>Lockett</u> is not controlling.   The circumstance that offended the Eighth and Fourteenth Amendments in <u>Lockett</u> was a state capital sentencing scheme by which sentencers were <u>statutorily</u> prohibited from considering any aspect of a defendants character or record and any of the circumstances of the offense that the defendant proffered as a basis for a sentence less than death as mitigating circumstances.  <u>See</u> <u>Lockett</u>, at 604-05.   Appellant does not argue the Pennsylvania capital sentencing procedures prevented the jury from considering evidence of mitigating circumstances; he simply asserts the jury misunderstood the jury instructions.

Moreover, even if the jury misunderstood the instructions, appellant is not entitled to relief.   As we have already discussed at length, the trial court's instructions in this case were more than adequate.   "The law presumes the jury will follow the instructions of the court."   Commonwealth v. Drumheller, 808 A.2d 893, 906 (Pa. 2002) (citations omitted). The only evidence appellant offers to rebut this presumption is patently inadmissible. Defendants are prohibited from using post-verdict statements of jurors as means to contest their conviction in a post-conviction proceeding.   See Commonwealth v. Steele, 961 A.2d 786, 808 (Pa. 2008) (citation omitted).   "During an inquiry into the validity of a verdict, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict."   Pa.R.E. 606(b)(1).   The court may not receive a juror's affidavit or evidence of a juror's statement on these matters either.   Id.; see Steele, at 808.   The purpose of this so-called "no impeachment rule" is to prevent constant relitigation of matters decided by the jury, such as the kind appellant seeks. See Steele, at 808 (quoting Carter v. United States Steel Corporation, 604 A.2d 1010, 1013 (Pa. 1992)).   For all the reasons stated, appellant's argument regarding the jury's ability to consider mitigating evidence is meritless, and counsel cannot be deemed ineffective for failing to raise that claim.   See Washington, at 603.

**B.   Ineffectiveness Based on Counsel's Substandard Trial Performance**

Issues II, III, and VI contest some aspect of prior counsel's performance in the investigation and presentation of appellant's case.   Although "optimal representation is not required either by the constitution or common sense[,]" effective representation is required under the Sixth Amendment.   Commonwealth v. Garrity, 500 A.2d 1106, 1112 (Pa. 1985) (citing Strickland, at 687).   As explained more fully below, each of appellant's

claims fail on one or more of the latter two elements of the Pierce test because a reasonable basis existed for counsel's act or omission, or there is no significant probability the result of the proceeding would have been different absent the error.

**Issues II & III:   Failure to Investigate Mental Health**

Appellant argues he was denied effective assistance of counsel because trial counsel failed to investigate his mental health before the withdrawal of his severance request and his acceptance of a stipulated bench trial, and failed to investigate the allegations against appellant before deciding not to present any factual or affirmative defenses in the guilt phase.   Appellant's Brief, at 18-28.   This argument fails because there was a reasonable basis for trial counsel to omit the investigation.

Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary.   Commonwealth v. Cox, 983 A.2d 666, 692 (Pa. 2009) (citation omitted).   Counsel's strategic choices made after less than a complete investigation are considered reasonable, on a claim of ineffective assistance, precisely to the extent that reasonable professional judgments support limitations on the investigation.   Commonwealth v. Tedford, 960 A.2d 1, 40 (Pa. 2008) (citation omitted).   Failure to conduct a more intensive investigation, in the absence of any indication that such investigation would develop more than was already known, is simply not ineffectiveness.   Commonwealth v. Pursell, 724 A.2d 293, 306 (Pa. 1999) (citation omitted).

Trial counsel's approach to the guilt phase of this case was entirely reasonable. Upon assuming appellant's representation, trial counsel were presented with overwhelming evidence of his guilt, including DNA evidence, confessions to police, and appellant's writings describing both incidents in detail.   The inculpatory statements also militated against an insanity or diminished capacity defense because they explained

appellant's purposeful intent behind the killings, ruining any possibility of claiming he did not understand the nature of his acts, or that he did not know they were wrong. See 18 Pa.C.S. § 315(b)[9] (codifying common law M'Naghten rule[10] as definition of legal insanity in Pennsylvania). Trial counsel tried to have the statements suppressed. However, as already discussed, the trial court properly determined they were admissible. Also, per the PCRA court's findings, there was no indication of any mental condition that would have called appellant's competence to stand trial into question. Therefore, trial counsel declining to investigate appellant's competence to stand trial or to pursue manifestly unmeritorious mental health defenses was a reasonable decision and did not constitute ineffective assistance.

### Issue VI: Failure to Investigate and Present Mitigating Evidence

Appellant argues he was denied effective assistance because trial counsel failed to adequately investigate, develop, and present evidence of mitigating factors that may have outweighed the aggravating circumstances of his crime, sparing him the death penalty. Specifically, appellant argues proper representation would have proven the existence of three mitigating circumstances: (1) his lack of capacity to appreciate the

---

[9] Stating, in pertinent part:

> "[L]egally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

Id.

[10] M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843) (to establish defense on ground of insanity, it must be clearly proved that, at time of committing of act, party accused was laboring under such defect of reason, from disease of mind, as not to know nature and quality of act he was doing; or if he did know it, that he did not know he was doing what was wrong).

criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired; (2) his extreme emotional disturbance at the time of the crime; and (3) the catch-all mitigator.   Appellant argues trial counsel's representation at sentencing fell below professional norms because they failed to: (1) hire a mitigation specialist; (2) retain certain psychological experts; (3) obtain standard social history records, including educational and medical records, and thus failed to provide those to the mental health experts; (4) follow up on available leads; and (5) interview available lay witnesses.

First, the Sixth Amendment guarantees the accused's right to effective assistance of counsel; it does not guarantee his right to a mitigation specialist.   With regard to appellant's other suggested indicators of trial counsel's sub-standard performance, the reasonable basis prong of an ineffectiveness claim does "not question whether there were other more logical courses of action which counsel could have pursued; rather, … whether counsel's decisions had any reasonable basis." Chmiel, at 1160 (citation omitted).

Trial counsel conducted a reasonable investigation and put on a reasonable mitigation defense during the penalty phase.   Their investigation included compiling a social history from appellant and his family, interviewing numerous potential lay witnesses, and reviewing hundreds of pages of medical, school, counseling, and employment records.   They also retained two mental-health experts to examine appellant.   From that investigation, trial counsel estimated they had a reasonable chance of success at proving the three mitigators appellant now asserts.   At sentencing, trial counsel presented testimony from numerous lay witnesses and the two experts in support of those three mitigators.   Nevertheless, the jury was only convinced of one mitigator — that appellant was under extreme emotional disturbance at the time of his capital crimes. There is a possibility, however improbable, trial counsel might have had more success

had they paraded a team of psychological experts onto the stand during the penalty phase. However, reasonableness of an attorney's strategy may not be evaluated with the benefit of hindsight. All we must determine is whether the course of action chosen by trial counsel had some reasonable basis designed to effectuate the client's best interests; if so, the court will deem counsel effective. Commonwealth v. Williams, 899 A.2d 1060, 1063-64 (Pa. 2006) (citations omitted). Therefore, this argument fails the second prong of the Pierce test.

Even if trial counsel's handling of the penalty phase had been objectively unreasonable, it did not prejudice appellant. Given the overwhelming evidence to the contrary, it is unlikely testimony from any number of expert witnesses would have caused the jury to find appellant did not appreciate the criminality of his conduct or have the capacity to conform his conduct to the law.

Furthermore, even now, with the benefit of hindsight and extensive additional investigation, appellant only musters arguments in support of three mitigators. With regard to the murder of Avery Johnson, the jury found four aggravating circumstances, two of which were multiple murders and the murder of a child. See Commonwealth v. Koehler, 36 A.3d 121, 151-52 (Pa. 2012) (multiple murders and murder of child weigh heavy in aggravation). Even if trial counsel's performance in this case had been flawless, appellant almost certainly would still have received the death penalty. Therefore, appellant's argument also fails the third prong of the Pierce test.

### C. Cumulative Effect of Ineffectiveness Claims

In his final issue, appellant argues he is entitled to relief from his conviction and sentence because of the prejudicial effect of all other errors he highlighted, even if he is not entitled to relief on any one of those errors. No number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually, except occasionally

where the individual claims are all rejected solely for lack of prejudice. See Busanet, at 75 (citing Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009)). In this case each of appellant's individual ineffectiveness claims have been rejected for failing one or more of the first two prongs of the Pierce test; none has been rejected solely for lack of prejudice. Therefore, there is no basis for an accumulation claim.

**REQUEST FOR REMAND DUE TO PROCEDURAL ERRORS BY THE PCRA COURT**

Appellant argues he was denied full, fair, and reliable PCRA review because of numerous procedural errors by the PCRA court. Therefore, he requests a remand to correct the deficiencies. Such relief is not required.

**A. PCRA Court's Denial of Hearing on Certain Issues**

Appellant's first complaint concerning the PCRA proceedings is the denial of an evidentiary hearing on issues V, VIII, IX, and XI. He claims each of these issues involved a legitimate, material factual dispute requiring a hearing.

A PCRA court is only required to hold a hearing where the petition, or the Commonwealth's answer, raises an issue of material fact. Pa.R.Crim.P. 909(B)(1)-(2). When there are no disputed factual issues, an evidentiary hearing is not required. Id.; Commonwealth v. Morris, 684 A.2d 1037, 1042 (Pa. 1996) (citation omitted). If a PCRA petitioner's offer of proof is insufficient to establish a prima facie case, or his allegations are refuted by the existing record, an evidentiary hearing is unwarranted. See Commonwealth v. Hutchinson, 25 A.3d 277, 320 (Pa. 2011) (citation omitted); Commonwealth v. Walker, 36 A.3d 1, 17 (Pa. 2011).

There was sufficient information in the record for the PCRA court to decide issues V, VIII, IX, and XI without a hearing. There was no issue of material fact in issue V because voluminous evidence of appellant's mental health was introduced during hearings on other issues, and appellant's Sixth Amendment right to counsel argument

turned on a question of law. There was no issue of material fact in issue VIII because it was frivolous as a matter of law. There was no issue of material fact in issue IX because it pertains to closing statement comments by the prosecutor already captured in the record. There was no issue of material fact in issue XI because the jury statements proffered as the only evidence in support of the claim were inadmissible as a matter of law. Thus, the PCRA court did not err by refusing a hearing on these issues.

## B. Rulings at the PCRA Court Evidentiary Hearing

Appellant argues the PCRA court interfered with his right to adequately examine witnesses and present relevant testimony during his PCRA hearing in a number of ways, which collectively prevented crucial fact development in support of his claims. These issues are waived because appellant did not state them with sufficient specificity in his Concise Statement of Matters Complained of on Appeal. See Pa.R.A.P. 1925(b)(4)(vii). In his concise statement, appellant raised the issue:

> Whether the PCRA Court erred in denying Petitioner/Appellant's right to a full and fair post-conviction proceeding by prohibiting Petitioner from fully developing the evidence in support of his claims as a result of the Court's adverse ruling on Petitioner's proposed witness questions and documentary evidence offered for admission.

Appellant's Rule 1925(b) Statement, 5/23/12, at 7. The PCRA court found that statement insufficient to put it on notice of appellant's specific complaints with its proceedings, and therefore determined this issue to be waived. PCRA Court Opinion, 7/25/12, at 128.

We agree. The language cited from appellant's Rule 1925(b) statement does not adequately outline the five discrete evidentiary issues he later raised in his brief to this Court. The PCRA hearings in this case lasted for 22 days, fill well over one thousand pages of testimony transcript, and involved many evidentiary rulings. No one, even the

learned PCRA court, could have accurately honed in on the issues appellant attempts to raise in his brief from the issue statement quoted above.

In his reply brief, appellant cites <u>Tucker v. R.M. Tours</u>, 977 A.2d 1170, 1173 (Pa. 2009), for the proposition an appellate court should order clarification of a Rule 1925(b) statement if the matters stated therein are not sufficiently clear. <u>Tucker</u> held it is within an appellate court's discretion to order clarification of an issue raised in a concise statement of matters complained about on appeal, but in no sense is the court required or even encouraged to do so. <u>See</u> <u>id.</u> Accordingly, all of the issues appellant raises about the quality of the PCRA proceedings in this case are meritless or waived.

It further appears that, as in <u>Chmiel</u>, <u>supra</u>, PCRA counsel in this case have raised numerous claims that, beyond lacking merit, are patently frivolous and deliberately incoherent. PCRA counsel's predictable tactics designed merely to impede the already deliberate wheels of justice have become intolerable, and we repeat our prior warning in clearer terms — the failure to curb further abuse may demand disciplinary action.

The order of the PCRA court is hereby affirmed. Jurisdiction relinquished.

Mr. Chief Justice Castille, Mr. Justice Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

Mr. Chief Justice Castille files a concurring opinion.

Mr. Justice Saylor files a concurring opinion.

Mr. Justice Stevens files a concurring opinion in which Mr. Chief Justice Castille joins.